## HOLTON v. DAVIS et al.

(Circuit Court of Appeals, Ninth Circuit. February 25, 1901.)

No. 624.

1. JUDGMENT—IMPEACHMENT FOR FRAUD—JURISDICTION OF EQUITY.

A court of equity has jurisdiction to enjoin a defendant from availing himself of a judgment in his favor procured by his fraud at suit of one who was not a party to such judgment, but, as such jurisdiction rests upon the ground of fraud alone, it extends no further than to grant relief against its effect, and hence, to authorize the court to act, it must clearly and satisfactorily appear that, but for the fraud, the judgment would not have been rendered.

2. SAME—MEASURE OF PROOF REQUIRED.

To entitle a complainant to relief in equity against a judgment on the ground of fraud, the proof in support of the allegations of fraud must be clear, distinct, and certain. The evidence may be circumstantial, but it must be persuasive; and, if there be any doubt or uncertainty, the relief must be denied.

3. SAME—EFFECT OF FALSE TESTIMONY.

A judgment cannot be impeached for fraud upon proof that a witness testified falsely on the trial of the case, although his testimony was material and important as corroborating other testimony, where the fact of its falsity was shown in support of a motion for new trial, which was nevertheless denied, and when the supreme court on appeal sustained the action of the trial court on the ground that, excluding such testimony, there was sufficient to sustain the judgment.

4. SAME—EVIDENCE OF FRAUDULENT CONSPIRACY—CONDUCT OF COUNSEL.

An allegation of a fraudulent conspiracy between a plaintiff and his counsel and the defendant in an action in the interests of the latter, made to impeach the judgment rendered in his favor, is not sustained or supported by the fact that plaintiff's counsel did not cross-examine certain of defendant's witnesses, nor make any attempt to impeach their testimony, where it does not appear that they knew any facts which would have aided the plaintiff, and no evidence is offered to show that their testimony could have been impeached; nor can such fraudulent conspiracy be predicated upon the fact that plaintiff's counsel failed to introduce certain evidence of which they had knowledge, where the expediency of its introduction was clearly a matter of judgment, and it does not even appear that their action was not for the best interests of their case.

5. SAME.

Proof that a witness, who had been known in the community as a prominent business man for many years, had some 15 years previous to the trial been a gambler, and had conducted a gambling house in the same community, does not tend to show that counsel for the adverse party were guilty of fraudulent conduct because they failed to introduce evidence of such facts for the purpose of impeaching the credibility of the witness, and especially where it was a matter of doubt, at least, whether by so doing they would not have prejudiced their own case.

6. SAME—EVIDENCE CONSIDERED.

Evidence considered, and held insufficient to sustain allegations of a fraudulent conspiracy between an administrator, as plaintiff in an action at law, and his counsel, on one side, and the defendant on the other, for the purpose of favoring the defendant in the trial of the action, such as would justify a court of equity in enjoining the defendant from availing himself of the benefit of the judgment in such action.

Ross, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Montana.

## Statement of the History and Pleadings.

No solution of the questions involved in this suit can properly or satisfac-torily be arrived at without a thorough knowledge of the facts and of the pleadings. The whole case depends upon the conclusions which the court may reach as to the facts. Before engaging in any discussion as to what facts are established by the testimony in the voluminous record before us, it becomes necessary to refer briefly to the litigation out of which the present controversy sprung into existence, and to some of the leading characters therein whose names are conspicuously mentioned in the record.

Andrew J. Davis, a resident of Butte, Mont., died in March, 1890, leaving an estate valued at over $4,000,000, which he had accumulated from mining, banking, and other business in which he had been engaged. Several years before his death, his nephew (who bears his name) Andrew J. Davis, came from Chicago, Ill., and, after serving in minor positions, was selected by his uncle as cashier of the First National Bank of Butte, the stock of which con-stitutes the bone of contention in the present suit. Owing to the identity of the uncle and nephew's names, we will adopt the course pursued by counsel, and designate the uncle as the "Judge" and the nephew as "Andy," so as to distinguish one from the other. The judge, for several years before his death, had been extensively engaged in mining, and in that branch of business was associated with James A. Talbott, who was "his right-hand man in his mining transactions." The judge was the owner of the entire capital stock of the bank at the time of its incorporation, and for several years prior to his death had managed its business through a board of trustees, among whom were Hiram Knowles, W. W. Dixon, his attorneys, and James A. Talbott, to whom, with others, he transferred to each 10 shares of the stock in order to qualify them as directors. After the judge's death, his brother, John A. Davis (the father of Andy), made application for letters of administration upon his brother's estate. Objections were made by numerous heirs of the estate to his appointment, and they recommended Henry A. Root for the appointment of administrator. A contest arose between them for the posi-tion, which resulted in the appointment by the court of John A. Davis as administrator of the estate. An appeal was taken from the order of the court to the supreme court of the state. Pending this appeal, a will was discovered, in which, by its terms, the entire estate of the judge (except a few small lega-cies) was left to his brother, John A. Davis. This will was filed for probate in July, 1890, and a contest in regard thereto immediately began between the different parties who claimed an interest in the estate,—John A. Davis and his friends and supporters on one side, and Henry A. Root and his support-ers on the other. Able counsel were employed by the respective parties, many of whom figure somewhat conspicuously in the present suit. Messrs. Kirkpatrick, Dixon, Woolworth, and Forbis & Forbis were employed by John A. Davis; Messrs. Toole, Clayberg & McConnell and Corbett & Welcome were counsel for Mr. Root, and at the trial Robert G. Ingersoll and Nathaniel Meyers, of New York City, were added to the array on behalf of Root. The jury disagreed. The case hung fire for several years, and was finally com-promised under an agreement, and the will was admitted to probate under the terms of this agreement. The bank stock was not specially involved in this settlement. The balance of the estate was divided among the heirs, claim-ants, and contesting parties. In this agreement it was expressly covenanted and agreed by and between all the parties thereto "that nothing in this agree-ment contained, either by reason of the execution hereof by the said Andrew J. Davis [Andy], one of the parties of the first part herein, for himself, or as attorney in fact for any other party hereto, or otherwise, shall be construed, or held, or taken in any wise to affect, or change, or enlarge, or diminish, or impair the respective rights or claims of the said estate of Andrew J. Davis, deceased, on the one part, or of the said Andrew J. Davis, one of the parties of the first part herein, on the other part, of, in, or to certain shares of the capital stock of the First National Bank of Butte, Montana, claimed by the said Andrew J. Davis [Andy], one of the parties of the first part herein, under and by virtue of a gift thereof to him as his individual property by the said Andrew J. Davis, deceased, or in any litigation that may now be pending or may hereafter be instituted relating in any way to the said shares.

of said stock; and no grant or conveyance herein made on the part of or by the said Andrew J. Davis, one of the parties of the first part herein, to any of the parties to this agreement, shall be held or construed to give or grant to any one any right or interest, or to waive any right the said Andrew J. Davis [Andy], one of the parties of the first part herein, has or claims in or to said shares of said stock, or any of them, claimed by him as his individual property under the gift above mentioned; nor shall any of the covenants or provisions of this agreement on his part apply to or affect said shares of stock, unless said shares should finally be adjudged to be the property of the said estate of Andrew J. Davis, deceased."

On March 30, 1891, a written agreement was entered into between W. W. Dixon, M. Kirkpatrick, and Forbis & Forbis, parties of the first part, and John A. Davis, of the second part. After mentioning the pending probate proceedings, and the fact that the parties of the first part had been retained as attorneys for said Davis, had acted as such, and intended to continue in that capacity, the agreement reads: "That said first parties herein hereby undertake and agree that they will devote their time and attention as attorneys in the interest and on behalf of the said John A. Davis in all matters arising out of the estate of Andrew J. Davis, deceased, until a final determination of all such litigation, and until the said estate shall be finally distributed to the parties entitled thereto; and that they will use their best efforts and endeavors for the interests of the said John A. Davis in whatever capacity he may claim the said estate, or any interest or property therein, and all litigation between him and others in reference thereto." In consideration of which services the party of the second part agreed to pay them for their services from the beginning to the end of the litigation a designated sum of money; and in the event that the will was probated, or a compromise or settlement made, they were to receive a further named sum. This was signed by the respective parties thereto, at the end of which appears the following:

"Whereas, I, John A. Davis, on this 30th day of March, 1891, have entered into a contract with W. W. Dixon, M. Kirkpatrick, and Forbis & Forbis, attorneys, copy of which contract is hereto attached, this is to certify that the said W. W. Dixon, M. Kirkpatrick, and Forbis & Forbis, attorneys, have, in making said contract, reserved the right to act as attorneys for my son, A. J. Davis, in any litigation that may arise in connection with his claim to be the owner of the stock of the First National Bank of Butte City, Montana, or that may arise in any other way concerning any interest he may have or claim to have in and to said stock; and I hereby agree that the said Dixon, Kirkpatrick, and Forbis & Forbis shall have the right to act as attorneys for the said A. J. Davis in relation to any such litigation over his claim or interest above named, whether I may or may not be concerned adversely in any such litigation, claim, or interest.   *   *   *        John A. Davis."

In 1893, James A. Talbott was appointed special administrator of the estate, and brought suit against Andy and the First National Bank to recover possession of the bank stock which Andy claimed by virtue of a gift from his deceased uncle. In commencing this suit Talbott employed several attorneys who had represented Root in his contest against John A. Davis, as well as others. The real question of fact involved in that suit was whether or not Judge Davis had made a gift causa mortis to his nephew, Andy, of the bank stock. The suit was tried in the state district court. Witnesses were examined on behalf of the respective parties. The plaintiff, among other things, put in evidence the by-laws of the bank, a proxy executed by Judge Davis before the date of the alleged gift, and the fact that thereafter this proxy was used at the stockholders' meeting of the bank held in January, 1890. On behalf of the defendant, Talbott was the only witness who testified directly to the gift to Andy of the bank stock, and in fact the whole case was made virtually to depend upon his testimony No attempt, whatever, was made to impeach him. His testimony was corroborated by one W. C. Darnold, who testified that in the month of February, 1890, Judge Davis told him that he had given the bank stock to Andy. Numerous other witnesses testified that Judge Davis had at different times told them that he intended to give Andy the bank stock. Among others, Judge Knowles testified that shortly prior to

Judge Davis' death he had consulted with him concerning the disposition of his property, etc. The attorneys for Talbott objected to this testimony because of the confidential relations which then existed between Judge Knowles and Judge Davis. This objection was overruled. The sum and substance of Judge Knowles' testimony was that in the consultations referred to Judge Davis told him that Andy was "to have or control the bank." He could not remember the exact words that were used. The attorneys for Talbott then withdrew their objections to the admissibility of the testimony, and thereafter persistently contended that his testimony showed a purpose on the part of Judge Davis to make a gift in the future, and that it could not consistently be relied upon to establish a "perfected gift in the past." James R. Boyce was called by plaintiff, and testified that Darnold was in his employ at the time that he had testified he was out of employment, and had applied to Judge Davis to get a position, and that this was the time that he had the conversation with Judge Davis. The district court rendered judgment in favor of Andy. Talbott applied for a new trial. Among other things, his attorneys procured an affidavit from Darnold to the effect that he had testified falsely on the trial. It is claimed that this affidavit was obtained upon a condition that it should not be used on the motion for a new trial. It was not so used. But the affidavits of two witnesses were procured to the effect that Darnold had told them that he had testified falsely at the trial. These affidavits were used upon the motion for a new trial. They also filed an affidavit of John B. Welcome, which was received too late for the consideration of the court, in which he stated that Darnold had told him, before the trial, that he never had any conversation with Judge Davis after his return from the Coast; that his conversation with Judge Davis was prior to that time; and that Judge Davis then stated that Andy owned the bank. The motion for a new trial was overruled. An appeal was taken to the supreme court, and the judgment of the district court was there affirmed. In the meantime John H. Leyson was appointed permanent administrator, and was substituted for James A. Talbott as plaintiff in the suit. Leyson v. Davis, 17 Mont. 220, 42 Pac. 775, 31 L. R. A. 429. A writ of error was taken to the supreme court of the United States, and was there dismissed because no federal question was involved in the case. Leyson v. Davis, 170 U. S. 36, 18 Sup. Ct. 500, 42 L. Ed. 939.

The present suit was commenced in the United States circuit court of Montana, February 21, 1898. Its character can best be stated by a reference to some of the most material allegations of the complaint. The bill contains many paragraphs, and sets forth at great length the several proceedings to which we have, in a general way, already referred. The allegations of fraud are all made "upon information and belief." Among other things, it is alleged: That John H. Leysen, at the time of his appointment as administrator of the estate, was heavily indebted to the bank and to Andy. That upon the request of complainant's counsel and of the heirs of the estate he refused to prosecute a writ of error to the supreme court of the United States, and that his refusal so to do was "by reason of a false, corrupt, and unlawful conspiracy between him and the said Andrew J. Davis, Jr., and by reason of the threats of the said defendant Andrew J. Davis, Jr., and by reason of a fraudulent agreement between them not to have said judgment reviewed, and to allow the time therefor to expire, so that the said Andrew J. Davis, Jr., defendant herein, may be secure in his possession of said stock." That the suit instituted by James A. Talbott "was brought pursuant to a corrupt, wrongful, and fraudulent conspiracy and agreement between the defendant James A. Talbott and the defendant Andrew J. Davis, Jr., which agreement, among other things, embraced the following: That the said Talbott should bring said suit, and should allow the defendant Andrew J. Davis, Jr., to present to the court full and clear evidence of said alleged gift; and that the said Talbott should be one of the witnesses of said Andrew J. Davis, Jr., and should give false evidence with respect to said pretended gift; and that the said Andrew J. Davis, Jr., should procure other false and perjured testimony; and that the said Talbott should not cause said witnesses to be cross-examined to any extent, and should not submit any evidence or facts in opposition to the said claim of the defendant Andrew J. Davis, Jr., and should

suppress all evidence in hostility to said claim; and that the said Talbott, as such administrator, should rely solely upon questions of law; and that all said matters were arranged and agreed to between the said defendant * * * and the said James A. Talbott; * * * that said suit, and the trial thereof, and the proceedings thereon all were false, fraudulent, and fictitious, and especially .in the following particulars." That witnesses were called on behalf of the defendant· Davis to substantiate his pretended claim tb said stock, all of whom were friends and intimates of the said defendant, and all of whom were called to testify, and did testify, to the alleged declarations made by the said Andrew J. Davis, deceased, in his lifetime, to the effect that some time in the future he intended to give the bank to the defendant. The names of several witnesses were then given, and it is then alleged: "That, pursuant to said fraudulent conspiracy and agreement, none. of said witnesses were asked one word in cross-examination by counsel for the said James A. Talbott, * * * and no evidence was offered by him or them to impeach them, or any of them. That the only witness called on behalf of the said defendant Andrew J. Davis, Jr., to establish the said pretended gift was the said James A. Talbott himself, who, as special administrator, was suing upon the theory that no such gift had been made. * * * That the testimony of said defendant James A. Talbott concerning said pretended gift was false, to the knowledge of both the defendants James A. Talbott and Andrew J. Davis, Jr. That the said James A. Talbott testified that at the time of said alleged gift there was no one present with the decedent except himself and the said Andrew J. Davis, Jr. That, notwithstanding the fact that the said James A. Talbott, in the year 1890, had given evidence in a proceeding in said court to the effect that such pretended gift was conditioned solely upon the said decedent's not returning from a trip to the Pacific coast, and the fact that said decedent had safely returned from said trip, and notwithstanding the fact that such evidence so given in the year 1890 was of the greatest importance to impeach the said James A. Talbott, nevertheless his testimony so given in the year 1890, in pursuance of said fraudulent and corrupt agreement, * * * was not offered in evidence upon the trial of said action. That the only other witnesses called on behalf of the said defendant Andrew J. Davis, Jr., were Hiram Knowles, president of said bank, and W. C. Darnold, a former employé of said bank. That their evidence purported to be concerning declarations of said decedent after the date of said alleged gift. * * * That pursuant to said fraudulent agreement and conspiracy substantially no cross-examination was had of the said Hiram Knowles, nor any objections made to his testimony in chief, wherein he was allowed to make a long and continuous statement, without interruption or objection, not only with respect to transactions in general, but to declarations of the deceased made to him, or purporting to have been made to him, when he, the said Hiram Knowles, was acting as attorney and counsel for the said Andrew J. Davis, deceased, and when such communications were privileged. That the last and only other witness for the defendant Andrew J. Davis, Jr., was the said William C. Darnold. That he testified, in substance, that after his discharge by the firm of J. R. Boyce & Company, of Butte, on or about January 31, 1890, and while seeking employment, between the 1st day of February and the 6th day of February, 1890, he called at the house of the decedent, Andrew J. Davis, when said decedent was very ill, and shortly prior to his death, and that the said decedent told him that he had given the bank to the said defendant Andrew J. Davis, Jr. * * * That the testimony of the said W. C. Darnold was wholly false and perjured, and · was known to be such at the time of such trial, both to the defendant Andrew J. Davis, Jr., and to the said James A. Talbott. * * * That said testi-. mony was procured and paid for by the defendant Andrew J. Davis, Jr.. knowing it to be false and perjured, and with the knowledge of the said James A. Talbott; and that the said W. C. Darnold was called as the last witness, and was removed from the state, * * * pursuant to said false. fraudulent, and corrupt conspiracy and agreement, and in order that his testimony might not be impeached or he be recalled. * * * That upon the . trial of said suit, pursuant to said false, fraudulent, and corrupt conspiracy, the said James A. Talbott, plaintiff therein, purposely failed to call witnesses

of whom he knew, who were within the jurisdiction of said court, and who would have testified that no such gift had been made, as claimed by the defendant Andrew J. Davis, Jr., or who would have testified that said gift was made simply conditioned upon the return of said decedent from a trip to the Pacific coast, and that he did so return, and that said gift therefore never took effect; and purposely refrained from cross-examining or endeavoring to impeach the character or veracity of any of the witnesses called on behalf of the defendant Andrew J. Davis, Jr.; and by reason of said conspiracy the said James A. Talbott neglected and refused to call witnesses of whom he knew, who would have testified that after the date of said alleged gift, if any was made, the said decedent, Andrew J. Davis, wholly rescinded and revoked the same. * * * That, pursuant to said corrupt, fraudulent, and unlawful agreement and conspiracy, the said James A. Talbott, as such special administrator in said suit, intended to call no witnesses at all in opposition to the said claim made by the defendant Andrew J. Davis, Jr., but that, however, one James R. Boyce, Jr., who had been associated in business with said decedent, was present in court, and upon hearing the testimony the said Boyce interviewed counsel for the said James A. Talbott as such administrator, and told them of important evidence against the validity of the claim made by the said Andrew J. Davis, Jr., and requested to be called as a witness. That the said James R. Boyce, Jr., had not been subpoenaed as a witness at said trial at all. * * * That the said James R. Boyce, Jr., advised the said counsel for the said James A. Talbott that the said Darnold, who had been called as a witness for the defendant Andrew J. Davis, Jr., therein, had not been discharged January 31, 1890, by the firm of J. R. Boyce, Jr., & Co., but had continued with said firm until the 1st of March, 1890; and that he, the said James R. Boyce, Jr., had the books of said firm, which would show entries made by the said Darnold throughout the month of February, 1890; but that, nevertheless, and in spite of this, the said James A. Talbott, as such administrator, or his attorneys, pursuant to said fraudulent conspiracy, although they called the said James R. Boyce, Jr., as a witness at his request, purposely neglected to have present in court the said books of said firm, which would have shown conclusively the false and fraudulent statements made by the said Darnold. * * * That the said James A. Talbott and his said attorneys well knew that the date of the alleged call by the said Darnold upon the said decedent was of the greatest importance. * * * Furthermore, the said James R. Boyce, Jr., communicated to the said James A. Talbott, as such special administrator, and to his said attorneys, the further facts that the defendant Andrew J. Davis, Jr., had stated to him on or about March 13, 1890. that the said decedent, Andrew J. Davis, had left him wholly unprovided for; that he was dependent solely upon his salary; and that he was relying upon his friends to help him get the bank stock, inasmuch as some of them had said to him that they had heard said decedent say that he intended to give the stock to him. And the said James R. Boyce, Jr., further communicated to the said James A. Talbott and his said attorneys further conversations had between him, the said James R. Boyce, Jr., and the said Andrew J. Davis, Jr., in March, 1890, wherein the defendant Andrew J. Davis, Jr., had reiterated said statement, and had requested the said James R. Boyce, Jr., to testify that he had heard said decedent say that he intended to give said stock to the defendant Andrew J. Davis, Jr., and the further fact that he, the said James R. Boyce, Jr., had refused to so testify. * * * That the said James R. Boyce, Jr., further communicated to said James A. Talbott, as special administrator, or to his attorneys, the fact that he, the said James R. Boyce, Jr., had had a conversation with the said James A. Talbott, of the city of Butte, in the state of Montana, in March, 1890, wherein the said James A. Talbott had stated that he was present at one time when said decedent handed a box to the defendant Andrew J. Davis, Jr., just prior to said decedent's going on a visit to the Pacific coast, and that the said decedent had said to the defendant Andrew J. Davis, Jr., 'If I don't come back, this is yours;' and wherein the said James A. Talbott had stated to the said James R. Boyce, Jr., that neither he nor the defendant Andrew J. Davis knew what the said box contained; and wherein the said James A. Talbott stated that the said gift was wholly contingent upon the said decedent's not

coming back from the Pacific coast, and that, inasmuch as he did return, no gift had been consummated; and wherein he, the said James A. Talbott, had stated that upon the return of said decedent from the Pacific coast the said decedent retook possession of said box, and restored it to its place in the defendant bank; and wherein the said Talbott had stated that at the time of the alleged gift the said decedent did not give the keys to the defendant Andrew J. Davis, Jr., nor was said box opened at all. That, nevertheless, and in spite of the fact that all of the foregoing matters were communicated to the said James A. Talbott, as such special administrator, or to his said attorneys, prior to the time when the said James R. Boyce, Jr., was called' as a witness, he was asked no questions whatever with respect to any such matters. * * * That the failure to examine said James R. Boyce, Jr., upon said matters was due to the false, fraudulent, and corrupt agreement and conspiracy made by and between the said James A. Talbott, as such special administrator, and the said Andrew J. Davis, Jr., as defendant herein. * * * That at the time of said trial there were witnesses in the state of Montana, who knew that no such gift had been made as claimed by the defendant Andrew J. Davis, Jr., and who would have testified that any gift was wholly contingent upon the return of said decedent from the Pacific coast, and that he subsequently returned, and who would have testified that the said Darnold had never called upon the decedent as stated by him; * * * and that any gift or pretended gift had been wholly rescinded and revoked,—all of which facts were known to the said conspirators, James A. Talbott and the defendant Andrew J. Davis, Jr. That not only did the said James A. Talbott fail to call any such witnesses, but, furthermore, he and the defendant Andrew J. Davis, Jr., * * * failed to call such witnesses, and procured some or all of said witnesses to be otherwise engaged or occupied, or to be out of the jurisdiction of said court, at the time of said trial, so that their testimony could not be taken, and so that by no chance might they be examined as witnesses in opposition to said claim. * * * That the said W. C. Darnold, after the conclusion of his testimony in said suit, and prior to the time when the said James R. Boyce, Jr., was called as a witness, confessed to the said James R. Boyce, Jr., that the testimony he had given was false; that the conversation he had, if any, with said decedent was in the year 1886; that the whole thing was a steal anyway, and he was testifying for the money that was in it; that they were trying to steal the bank, and he wanted to get his picking out of it; that he would get from forty to sixty thousand dollars for testifying as he did; and that he would have a competency for life, and would be able to go back among his people, and live well. * * * That, upon the making of said confession, the said James R. Boyce, Jr., stated what the said W. C. Darnold had confessed to him as aforesaid to the said James A. Talbott, or his said attorney and counsel, and offered to testify thereto, but that, although the said James R. Boyce, Jr., was called as a witness, no questions were asked him in regard thereto. * * * That this omission so to do was by reason of the false, fraudulent, and corrupt conspiracy hereinbefore set forth. * * * That after said confession, * * * and before the close of the trial, and at a time when the said witness Darnold might have been recalled, the defendant Andrew J. Davis, Jr., pursuant to the said fraudulent conspiracy, and with the knowledge and approval of the defendant John E. Davis and the defendant James A. Talbott caused the said witness Darnold to be taken without the jurisdiction of the courts of Montana, and away from the said trial, and caused him to be kept away from the state of Montana until on or about the 1st day of July, 1894, and until long after the end of said trial, and until long after the judgment therein had been pronounced; and that during the absence of the said Darnold he was wholly supported by the said Andrew J. Davis, Jr., and the said John E. Davis, and with the knowledge of the said defendant James A. Talbott, and was given or furnished with the sum of about fifteen hundred dollars, in addition to other amounts * * * paid to him by the defendant Andrew J. Davis, Jr., in payment of his false and perjured testimony as aforesaid. * * * That prior to the giving of his said testimony the said Darnold was poor and impoverished, and wholly without means, but that since that time he has been in prosperous circumstances, and has been,

from time to time, paid large sums of money by the defendant Andrew J. Davis, Jr., by reason of his services in giving said false and perjured testimony; * * * and that by reason of such acts it was impossible for any one to have recalled the said Darnold upon the trial of said action, or to have put in his evidence, or to have cross-examined him with respect to his said confession or otherwise. * * * That the said W. C. Darnold, after his return to the city of Butte, Montana, in July, 1894, wrote a certain letter to the defendant Andrew J. Davis, Jr., dated July 6, 1894, a copy of which is annexed hereto, and marked 'Exhibit A,' wherein and whereby the said Darnold demanded of the said Andrew J. Davis, Jr., the sum of $10,000 in consideration of his false and perjured testimony so given as aforesaid, which said letter was delivered to the said Andrew J. Davis, Jr., at or about the time of its date; and that thereafter, in response thereto, the said Andrew J. Davis, from time to time, has paid to the said W. C. Darnold various sums of money, and has had various interviews with him, all touching the said fraudulent testimony so given by him as aforesaid. * * * That, had it not been for such false, fraudulent, and corrupt proceedings and acts and omissions as have been hereinbefore alleged, the said judgment would not have been rendered, the said motion for a new trial would have been granted, or the said supreme court of Montana would have reversed the said judgment and said order. * * * That said action was substantially undefended by the said James A. Talbott, as such special administrator, as against the claim of the defendant Andrew J. Davis, Jr. That by said fraudulent conspiracy there was substantially no conflict of evidence. That * * * James A. Talbott was the only witness to the gift. * * * That, if the said conspiracy had not existed, other witnesses could have been called to show what occurred at the time of said alleged gift, and to show that there was no such gift; but that such witnesses were suppressed or removed pursuant to said conspiracy by the said defendants. * * * That said supreme court of Montana was passing upon a fraudulent and fictitious record made up by consent with suppression of evidence as aforesaid. * * * That said judgment so rendered as aforesaid, and the affirmance thereof by said supreme court, was based upon a record conceived in fraud by and between the parties to said suit, in the particulars hereinbefore specifically set forth. * * * And your orator alleges that she was not a party to said suit, nor did she have any control over the same; and that none of the matters hereinbefore set forth were brought to the attention of the court, but wholly lay in the knowledge of the said conspirators as aforesaid, and that your orator had no knowledge of any of such facts, or of said fraudulent conspiracy, or any of the matters of fraud hereinbefore set forth, until long after the decision by said supreme court of Montana on appeal, and not until the latter part of the year 1896."

The prayer of the bill is for an injunction enjoining the defendant Andrew J. Davis, his servants, agents, and attorneys, from availing himself or themselves of the judgment or decree whereby the title to said shares of the bank stock was declared to be in the defendant, for a receiver, an accounting, and for such other and further relief as the complainant may be entitled to in the premises.

The letter marked "Exhibit A," referred to in said bill of complaint, and annexed thereto, is as follows:

"Butte, Mont., July 6, 1894.

"H. A. Davis, Esq.—Dear Sir: Having made several unsuccessful attempts to meet and have an interview with you, and failed, I adopt this method of placing before you the circumstance as I see it. You are well aware that in my testimony I strained great point, and in doing so accomplished for you one million and seventy-two thousand dollars, and I feel that any circumstances that might arise that would change or impeach that testimony would be both disastrous to you and myself. In order to avoid that, I desire to place before you the following conditions, to wit: That you deal with me straight, and through no second or third parties, and that I bind myself to carry out every obligation that I have made. There is strong pressure brought to bear upon me to rescind my testimony, or the portion of it as to dates, which I am fully guarantied that if I do will result in nothing disastrous to me.

108 F.—10

But, if you will comply with the requirements herein stated, I will quietly leave this country, and under no circumstance return again. * * * I have this proposition to offer you, and it will be final, and it is not a hundredth part of what my—the only direct—testimony in the case, of which I have been assured by the most eminent counsel in this country and Ohio in the case, that my own, and mine alone, was the pivoting and only testimony which gained to you one million and seventy-two thousand dollars. Now, to be candid, and as final to everything connected with these affairs, under no circumstances will it ever arise again through any pressure that may be brought to bear upon me by the opposite party. I will state that I want ten thousand dollars, in consideration of which I agree to go back to Ohio, go into business, stay there, and return to Butte subject to nobody's orders but your own, which may only affect subsequent business of your own; and that, if you will deal with me personally, and with nobody else, I will religiously carry out every stipulation in this instrument. I am very serious in this thing, and want you to know that I have positive assurance that if I rescind my testimony, even to the verge of perjury, that I will be fully protected to any amount. I do not do this in the form of a threat, but only as a reasonable consideration for what I have done for you. Candidly consider this without bias; weigh every point in the case. I place myself in jeopardy in doing this, yet I do it with my eyes open. No other consideration except the above stated will go. Give me a hearing at John Davis' store to-morrow at 2 o'clock p. m., as that is the extreme limit that I have from other sources.

"Yours, truly,                                        W. C. Darnold."

After hearing the evidence in this case, the court rendered a decree that complainant's bill be dismissed, and defendants have their costs. From this decree the complainant appeals to this court.

The testimony of Mr. Talbott given in the bank suit (referred to in the opinion) is contained in the record in the supreme court of Montana, embodied herein. The testimony, direct and cross, covered 65 pages of printed matter, and sets forth at great length all of his relations with the judge and with Andy, and the relations and close friendship and intimacy between the judge and Andy, and all the minute details and conversations that occurred between the judge, Andy, and himself at the time the gift was made, and the condition of Judge Davis' health at that time, etc. Leaving out the minute details, we here give his direct testimony relating specifically to the gift, as follows: "They [the judge and Andy] understood that there were 950 shares. Andy counted it up. There were 950 outside of what the directors had. Andy passed them over to the judge after he figured up, and showed him what there was of it, and he passed it back again, and he said: 'I have always intended that for you. You take that.' Q. The judge passed it back to Andy? A. Passed it back to Andy; yes, sir. Q. After Andy had figured it up, and handed it to the judge? A. Yes, sir. Q. And said what? A. He said, 'I have always intended that for you.' He says, 'And I want you to take it.' * * * Q. What did Andy do with this stock? A. He put it in his pocket."

Defendants' Exhibits B and C, letters written by Boyce to Darnold, referred to in the opinion, read as follows:

Exhibit B.

"Butte, Montana, Jan. 14th, 1896.

"W. C. Darnold, Esq., Piqua, Ohio—Dear Sir: I wrote you some time ago, but received no reply. The cases of Eastern creditors of the firm of J. R. Boyce, Jr., & Co., will come to trial in the next 60 or 90 days at furthest. Will you give testimony to the facts and truths known to you or not? If so, will you come here, or shall I send depositions to be sent you? I am preparing to follow with a suit against the bank for wrong procedure for the $60,000.00 investment, under an accounting, which has been twice paid to the bank. * * * I hope to be successful against the bank. Inasmuch as I owe it largely to your knowledge of books in bringing to light the errors contained therein, I feel in duty bound to reimburse you for labor performed in the event I regain the losses sustained in and by the wrongful proceedings of the bank. Your knowledge of the firm books makes you a material witness in righting a wrong. As you know, you will not have to strain a point

in behalf of myself. All that is required is simply to tell the truth as to Davis' business relation with the firm. Your affidavit in regard to correcting a former wrong is safe in my hands. The supreme court has sustained the decision of Judge McHatton, and given Andy the bank. This ungrateful little rascal rolls in the wealth that you have given him, and, unless he has given you something more than he did while you were here for that which he knew was the only testimony that gave him the bank stock, he is inhuman, to say the least of it. * * * He feels his security, however, and apparently fears no danger from either you or me. I have no desire to heap vengeance upon any man, but must say that this is a cold-blooded transaction upon the part of Andy Davis. * * *

Exhibit C.

"Butte, Montana, June 17, '94.

"W. C. Darnold, Esq., Piqua, Ohio—Dear Darnold: * * * I have frequently called attention to Farwell & Co. to the position you held, and intended to mention in behalf of their interests and other creditors, reminding them of your telegram to them, &c., thus placing you before them as not only being worthy of recognition, but fully capable of holding important positions in their employ. I think they will recognize your interest in their behalf, and will be able to aid you in getting a good situation until such a time as you may do better. You well know the great wrong that has been perpetrated upon Eastern creditors and myself, and you cannot conscientiously remain silent from any standpoint, and close your lips against infamy. I cannot believe that money would induce you to remain away, and thus suppress the truth of your knowledge, particularly as my acts have been uniformly kind and generous in feeling. I had no motive in my kindness and the extenuation of home courtesies further than to bring out the truths, too well known to be suppressed. You well know that my home was always open to you, and you were welcome therein, whether I needed your evidence or not. You also know that there are 'patched up' entries on the books of J. R. B., Jr., & Co., which should be exposed in the interest of truth and honor; that these entries were made by unscrupulous persons for purposes too base to dwell upon; that conscience caused one of them to admit on deathbed that said entries were false, and would, in time, redound to my credit. My faith in you has not been weakened, and I believe that when the time comes you will not be found wanting. I confess that this faith in you is of a character that cannot be shaken until positive proof is shown that you are lower in the scale of manhood than others that have so deeply wronged me. I have always known you as an honest man. You proved yourself as such when in our employ. Now that you are more mature in thought and ripe in experience, it cannot be possible that you would wantonly absent yourself, and thus do me a greater wrong by silence than to be openly and avowedly my enemy. So far as I am personally concerned, it matters but little whether or not I regain my rights. I am willing to go unrewarded so far as this world's goods are concerned, but to suppress the truth—withhold same—to detriment of others' interests, when in your power to restore their rights that so largely rest in us, is a crime against justice, to say nothing of that greater crime against the higher law given us by those God-given powers which form the basis of all transactions both here and hereafter. * * * Of course, I was astonished that you alone held the key of Andy's fate. I well knew of your conversation with the judge, as you related it to me, that occurred in 1887, when Andy discharged you, and you went to the sick room of the judge in that year (1887); but did not know that you were present at the last moments of the judge in 1890. Upon your words 'hung the law and the testimony' and Andy's claim for the bank. Now that he has it, let him enjoy it; but let us not forget to bring out the truth, and make him disgorge wrongful gains, which he holds under the law, but in violation of truth and the facts best known to yourself and myself. Kindly write me, and say if you will return in the interest of justice. I will see that you have transportation furnished, &c., 'both ways.' In the meantime apply to Farwell & Co. for a position, and in the end we will gather strength, and regain our losses and former standing. With kind wishes, I am,

"Yours, &c.,                                        J. R. Boyce, Jr."

Several letters written by Boyce to Mrs. Darnold also appear in the record, breathing the same spirit, and relating to the same matters, couched in many respects in nearly the same language. It is unnecessary to quote them.

There are nine specific assignments of error, which counsel for appellant in his brief has resolved into three, viz.: "(1) The court erred in finding for the defendant because the evidence clearly showed that the judgment of the state court had been procured by fraud, collusion, and conspiracy between the parties thereto and their attorneys; because the judgment was the result of mistake, accident, or surprise, and was against equity and good conscience; and because the complainant, Harriet Wood, was entirely without fault or negligence. (2) The court was further in error because, although the evidence as given in the state court suit and as disclosed in the present suit clearly prove that no gift causa mortis had ever been made, clearly proved that there was a good defense to the cause of action, and although it appeared that the complainant, Harriet Wood, was not a party to the action in the state court, had no control over it, and never had had her day in court, nevertheless, the lower court refused to consider the said evidence with respect to the validity or invalidity of the alleged gift, and refused to re-examine the claim of Andrew J. Davis, Jr., on the merit and irrespective of the questions of fraud extrinsic to the cause of action. (3) Because the court refused to allow complainant to amend her bill of complaint so as to set up facts concerning bribery and corruption which were discovered after the beginning of the suit."

Walter S. Logan, Charles M. Demond, and C. P. Drennen, for appellant.

Forbis & Forbis and W. W. Dixon, for Andrew J. Davis, Jr., and the First National Bank of Butte.

William Scallon, for James A. Talbott.

William Scallon and John W. Cotter, for John H. Leyson.

E. N. Harwood, for appellee John E. Davis.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement of facts, delivered the opinion of the court.

This suit was instituted by Mrs. Harriet Wood, a sister of Judge Davis, deceased, against Andrew J. Davis, Jr., the First National Bank of Butte, Mont., James A. Talbott, formerly special administrator of the estate of Andrew J. Davis, deceased, John H. Leyson, as administrator with the will annexed of Andrew J. Davis, deceased, and John E. Davis, as administrator of the estate of John A. Davis, deceased, to enjoin the defendant Andrew J. Davis, Jr. (who will be hereinafter designated as "Andy"), from availing himself of a judgment obtained by him in the district court of Silver Bow county, state of Montana, and affirmed in the supreme court of that state, which declared and adjudicated that Andy was entitled to 950 shares of the capital stock of the bank. The theory upon which the suit was brought and tried is that the judgment obtained by Andy in the state court was procured by fraud, conspiracy, and collusion, and that Andy should not, in equity, be allowed to avail himself of or to derive any benefits therefrom. The history concerning the prior litigation, and the essential facts in relation thereto, and the specific allegations in the bill of complaint as to the alleged frauds, conspiracy, collusion, and wrongdoing of the parties defendant herein, and of all the counsel for the respective parties, are set

forth at great length in the general statement we have made, and to which we will have frequent occasion to refer. The case is in many respects peculiar in its character. It is doubtful, to say the least, if any parallel case could be found in the books where so many wholesale charges of corruption, fraud, and conspiracy can be found. To read these charges, independent of the proofs, the mind would be led to believe that all the proceedings in the state court relative to the bank stock were conceived in sin and brought forth in iniquity by Andy and his co-conspirators. Although all the charges are made on information and belief, they are couched in language direct, positive, and clear, and, if proven as charged, would necessarily demand and receive from this court the severest condemnation that language affords to all parties concerned therein, irrespective of their standing and position in the community where they reside, and the relief asked for should be granted without any hesitation.

At the threshold of any discussion herein it becomes necessary to determine the scope of our power and the extent of our duty in the premises, and to ascertain whether or not there is any limit in equity to the inquiries we are herein called upon to make. It is admitted by appellant that this court cannot, in this suit, review or set aside the judgment obtained in the state court. As against the parties in that suit the judgment rendered in the state court is final. But if it be true that it was procured by fraud, of which the complainant had no knowledge, and, but for such fraud, it would not have been obtained, then it would be against equity and good conscience to allow the party who had won his case by fraud, collusion, perjury, or conspiracy to reap any advantage or benefit by such fraudulent acts. Any judgment thus rendered upon a false, fraudulent, and fictitious record does not possess any verity in the law, and can always be assailed in an independent suit brought by any party interested who is not a party to the action, and did not participate in the fraud, or have any knowledge of it until after the judgment was obtained and became final. The general rule upon this subject is well expressed in Marshall v. Holmes, 141 U. S. 589, 596, 12 Sup. Ct. 62, 64, 35 L. Ed. 870, 873, as follows:

"While, as a general rule, a defense cannot be set up in equity which has been fully and fairly tried at law, and although, in view of the large powers now exercised by courts of law over their judgments, a court of the United States, sitting in equity, will not assume to control such judgments for the purpose simply of giving a new trial, it is the settled doctrine that 'any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery.' Insurance Co. v. Hodgson, 7 Cranch, 332, 336, 3 L. Ed. 362; Hendrickson v. Hinckley, 17 How. 443, 445, 15 L. Ed. 123; Crim v. Handley, 94 U. S. 652, 653, 24 L. Ed. 216; Metcalf v. Williams, 104 U. S. 93, 96, 26 L. Ed. 665; Embry v. Palmer, 107 U. S. 3, 11, 2 Sup. Ct. 25, 27 L. Ed. 346; Knox Co. v. Harshman, 133 U. S. 152, 154, 10 Sup. Ct. 257. 33 L. Ed. 586: 2 Story, Eq. Jur. §§ 887, 1574; Floyd v. Jayne, 6 Johns. Ch. 479, 482. See, also, U. S. v. Throckmorton, 98 U. S. 61, 65, 25 L. Ed. 93."

To the same effect, North Chicago Rolling-Mill Co. v. St. Louis Ore & Steel Co., 152 U. S. 596, 615, 14 Sup. Ct. 710, 38 L. Ed. 565.

In 2 Story, Eq. Jur. § 1574, the learned author says:

"The new trial is never granted in terms. There can be, in no such case, anything like another trial in the court of law. The case is effectually ended there. But where there was a distinct and decided fraud in the proceedings by which the judgment at law was obtained,—as by putting in testimony which the party believed to be false; by giving no notice of the suit, or one calculated to mislead the defendant, and thus deprive him of an opportunity to be heard in the trial at law; or, in any similar mode, making the trial at law fictitious or fallacious; and also where the defendant at law, through accident or mistake, and without default in the proper degree of watchfulness and care required of careful men in their own concerns of equal importance, fails to present his defense fully,—courts of equity will, in their discretion, grant relief by re-examining the case upon its merits, * * * enjoining the party from pursuing the judgment at law."

It is equally well settled by the authorities that the mere fact that false testimony was given or procured in the trial of the case in the state court by the successful party is not of itself a sufficient ground for enjoining the enforcement of the judgment, unless it clearly and satisfactorily appears that there is a reasonable certainty that the result of the judgment or of a new trial would have been different if such false and fraudulent testimony had not been given. In Dringer v. Railway Co., 42 N. J. Eq. 573, 581, 8 Atl. 811, 815, the vice chancellor, in reviewing this question, among other things said:

"A court of equity may unquestionably annul a judgment or decree which has been obtained by fraud, but, in order to justify such an exercise of power, it must be made clearly to appear that the judgment or decree has no other foundation than fraud; in other words, it must be made to appear that, if there had been no fraud, there would have been no judgment or decree. An attempt to exercise a wider or more liberal jurisdiction in cases of this class would, it will be perceived, necessarily enlarge the jurisdiction of courts of equity so as to make them practically courts for the review of the judicial acts of other tribunals, and not tribunals with just sufficient power to redress frauds by undoing what fraud has done. * * * A simple statement of the ground upon which jurisdiction in such cases rests shows that, unless the decree assailed is shown to be the sole and direct product of the fraud charged, this court has no authority whatever either to annul or change it, for its jurisdiction is unalterably limited to the simple undoing of what fraud has done. It is therefore clear that, if this decree has any other foundation than the fraud here charged, this court, even if convinced that the decree is unjust according to the real right of the case, cannot disturb it."

The principles announced in these decisions are sustained by numerous authorities, a few of which we here cite: Ross v. Wood, 70 N. Y. 8, 12; In re Griffith's Estate, 84 Cal. 108, 112, 23 Pac. 528, 24 Pac. 381; Pico v. Cohn, 91 Cal. 129, 133, 25 Pac. 970, 27 Pac. 537, 13 L. R. A. 336; Smith v. Allen, 63 Ill. 474; 3 Pom. Eq. Jur. §§ 1362–1364; 1 Story, Eq. Jur. § 252a; 3 Enc. Pl. & Prac. 629, 630, and authorities there cited. In the light of these general principles we will proceed to examine the testimony contained in the record to see what, if any, of the material charges of fraud, collusion, conspiracy, bribery, or corruption alleged in complainant's bill are established by the evidence; and whether or not those which are proven, if any, are of such a character as to justify this court in granting the relief prayed for herein. As to the character of proof necessary to sustain the charges it must constantly be borne in mind that fraud is never presumed. It may, however, be inferred

from facts and circumstances connected with the transactions; but in all cases of this character the fraud, collusion, or conspiracy alleged in the bill must be proven to the satisfaction of the court. The proof upon these points, in order to entitle complainant to any relief, must be clear, distinct, and certain. If there be any doubt or uncertainty, the relief asked for should be denied. 3 Enc. Pl. & Prac. 628, and authorities there cited; Boyden v. Reed, 55 Ill. 458, 464; Doughty v. Doughty, 27 N. J. Eq. 315, 320; Baltzer v. Railroad Co., 115 U. S. 634, 645, 6 Sup. Ct. 216, 29 L. Ed. 505, and authorities there cited; Lalone v. U. S., 164 U. S. 255, 257, 17 Sup. Ct. 74, 41 L. Ed. 425. In the case last cited the court said:

"The rule is of long standing, and is of universal application, that the evidence tending to prove the fraud, and upon which to found a verdict or decree, must be clear and satisfactory. It may be circumstantial, but it must be persuasive."

It is difficult to separate the various charges of fraud against the different parties so that they can be independently discussed. They are all more or less interwoven with each other, and so blended together as to make it necessary, to some extent, at least, while considering the charge against one, to refer to its association with the acts and conduct of the others. At the bottom of the whole case lies the charge of collusion and conspiracy, which in one fell swoop includes everybody that was in any way connected with the case on the side of Andy. Nevertheless, keeping constantly in mind the relation which each witness and each party bears to the whole case, we will endeavor to classify them under separate heads.

1. As to W. C. Darnold. This witness, as painted in the record before this court, is stained with perjury, bribery, and corruption to such an extent as to justify the statement that his testimony given at the trial of the state court must be considered as wholly unworthy of belief, and absolutely false. If, therefore, the case in the state court rested upon his testimony alone to establish the fact that Judge Davis made a gift causa mortis of his bank stock to Andy, it might, of itself, be deemed sufficient to enable the complainant to maintain this suit. But the fact is that the question as to the gift in the state court did not depend alone upon the testimony of Darnold. His testimony was simply corroborative of the testimony of Talbott that the gift was actually made. We have no means of determining what effect his testimony had upon the mind of the district judge in deciding the case in favor of Andy. His testimony was important. Standing unimpeached, it was entitled to great weight, and tended strongly to show that the gift causa mortis must have been made by Judge Davis to his nephew, as testified to by Talbott; and it may be that the district court in deciding the case gave full credence to Darnold's testimony. But a motion for a new trial was made, one of the grounds thereof being that Darnold had testified falsely at the trial. In support of this ground the counsel for the plaintiff in that case procured the affidavits of two witnesses,—Curtis and Boyce,—both of whom stated that Darnold had confessed to them that he swore falsely upon the trial of the case in the district court. In addition to this,

they procured the testimony of Boyce, as set forth in the statement of this case, which directly tended to impeach the testimony given by Darnold as to the time—which was highly important—when he had the alleged conversation with Judge Davis wherein the judge told him he had given the bank stock to Andy. Notwithstanding this testimony, which reflected so severely upon the testimony of Darnold, the court refused to grant a new trial, and it ought, perhaps, to be assumed that the court in so doing considered that, without reference to Darnold, there was ample and sufficient testimony to sustain the gift. But, be that as it may, the case was appealed to the supreme court, and in considering the question whether or not the district court erred in refusing to grant a new trial the court said:

"The same evidence produced on this trial, if the testimony of Darnold were excluded, would be abundantly sufficient to sustain the conclusion reached by the district court; and courts will not grant new trials where it is apparent from the record that the result would probably be the same. U. S. v. Biena (N. M.) 42 Pac. 70."

It is therefore manifest that the testimony of Darnold, however false it may be admitted to be, will not warrant any interference with the judgment obtained by Andy. But it is strenuously argued that his testimony was procured pursuant to the conspiracy alleged in the bill to get the bank stock for Andy; that, in furtherance of this general plan, Darnold was held back as the last witness, and then spirited away by means furnished by the chief conspirators acting in collusion with the counsel employed by Talbott; that he was kept away until the trial was over, and during his absence "was wholly supported" by Andy; that, although the counsel were told that Darnold had committed perjury, and informed that he could be impeached by the production of the books of Boyce, where Darnold was employed at the time he testified he was out of employment and had the conversation with Judge Davis, but counsel did not produce the books of Boyce; that Darnold made an affidavit confessing his perjury; that this affidavit, procured at the instance of Boyce, was placed in the hands of the counsel for plaintiff, and was by them suppressed; that other impeaching testimony against Darnold, known to Talbott and his counsel, could readily have been obtained, but, owing to the conspiracy, was not procured on the motion for new trial; that, with the knowledge of Talbott, Darnold was furnished with the sum of $1,500 in payment of his "false and perjured testimony"; that since that time Andy has paid him "large sums of money" in compensation for his "false and perjured testimony"; that, in response to the letter marked "Exhibit A," Andy "from time to time" has paid "to Darnold various sums of money, and has had various interviews with him, all touching the said fraudulent testimony," etc. What does the testimony in this case show in relation to these alleged acts of collusion and conspiracy? Is there any evidence to sustain these charges, or either of them? What do the proofs show? There is some hearsay testimony as to certain declarations alleged to have been made to Boyce by Darnold, and by others, that are well calculated to create suspicion "of

foul play" or "improper interference" by somebody. There is no evidence whatever to show that Andy ever gave Darnold large, or any, sums of money before or after the trial, or before or after the motion for new trial was made or disposed of, on account of his testimony, or of anything else. The only things, which do not rise to the dignity of evidence, bearing in the remotest degree upon this point, rest principally upon hearsay statements made to Boyce, and vivid imaginations of counsel drawn therefrom. For instance, the record shows that Darnold went away with one Genzberger, and Genzberger told Boyce that John Davis, a brother of Andy, sent him $25 while he was away. The only exception as to the hearsay evidence about money is found in the testimony of Boyce on behalf of complainant as follows:

"Q. You say Darnold had been living with you some months before the bank trial? A. Yes, sir. Q. What was his condition as to clothing and money at the time he was living with you? A. He was impoverished; destitute condition. Q. After giving his testimony at the bank trial, did you notice whether he had any money? A. He had some money. Q. At the time he made his confession to you, was that at some restaurant in Butte, do you remember? A. Yes, sir. Q. Who paid for the dinner? A. Darnold did. Q. Did you see him have any money? A. I did not see any large amount. He had some money."

Boyce further testified that, after Darnold had signed the affidavit admitting that he had sworn falsely, he was so "afraid of the law" that he (Boyce), out of pity, more than anything else, gave him $75, and took his note therefor, payable on demand, and afterwards received a "paper from him that he considerd it settled" on account of "work I have done for you and will do for you on these books." It does not appear that Andy ever replied to the letter exhibit A; that he ever paid any money to Darnold on account of the matters therein referred to. This letter is peculiar. It shows, according to its story, that there were two parties deeply interested in Darnold. One party had used him. The other party wanted to have like favors from him. If granted, they stood ready to compensate him for such services. They only wanted him to tell the truth. But they were willing to protect and shield him if he would rescind his former testimony, "even to the verge of perjury," and that they would see that "he was fully protected to any amount." It does not appear who gave this assurance,—whether it was complainant, the witness Boyce, or other persons. He prefers, however, to give Andy the first call, and only demands the "one-hundredth part" of what his services in giving the false and perjured testimony in his own estimation were worth, to wit, $10,000, and in a friendly spirit, "not in the way of a threat," informs him the money must be paid to him "personally," and that, if it is so paid before "to-morrow," assurance is given that he would be able to resist "any pressure that may be brought to bear upon him by the opposite party." The letter speaks for itself. It needs no interpretation. Boyce, who is complainant's chief witness, knew all about the letter at the time it was written. On the trial he produced the original letter, signed by Darnold, and testified that a copy thereof was sent by a messenger and delivered to Andy, who gave a receipt for it; and that the copy

thus sent was not signed by Darnold. Why was it sent? What was the motive upon the part of Darnold and Boyce in sending it? Are there not other facts and circumstances set forth in the testimony that will give some light upon this subject? After the receipt of this letter by Andy, he was seen walking and talking with Darnold; and at one time they were seen going into the bank together after office hours, and the blinds were then pulled down. This is deemed a strong circumstance, if not conclusive evidence, of the conspiracy. On no other theory can it be explained, argue counsel, why Andy should be seen talking to a confessed perjurer on the public streets, instead of prosecuting him for an attempt at blackmail. It is true that men are sometimes known by the company they keep. But those who live in glass houses ought to be careful not to throw stones; to judge not, lest they themselves be judged. The witness Boyce, who furnished to complainant all the information which he himself possessed as to Darnold's perjury and of all other suspicious circumstances told to him by others, with full knowledge of Darnold's character, was not ashamèd to be seen walking and talking to Darnold on the public streets of Butte, and inviting him to his house. He did not deem it to be derogatory to his own character to be seen in such company. He poses as a man whose only motive was to assist the ends of justice, in order that the truth might prevail, and fraud and perjury be condemned. His every effort was to reform Darnold; to induce him to be a man among men; to hold up his head, and tell the truth. Incidentally, however, it appears that Boyce and Andy had some misunderstanding about an account of $60,000 which Andy claimed Boyce & Co. owed the bank; that they could not agree; that an attachment was issued by the bank to secure the claim; that Boyce & Co., by means thereof, were, as Boyce states, ruined; that Darnold had knowledge of these transactions, and Boyce was anxious to secure Darnold's evidence with reference thereto. He was always friendly to Darnold. He procured from Darnold the affidavit that was placed in the possession of Talbott's counsel. Darnold insisted it should not be used unless he was guarantied full protection. Counsel could not or would not give the guaranty. If it was not used on motion for a new trial, it was to be held subject to Boyce's order. After the new trial was denied, Boyce demanded that the affidavit be returned to him, which was done. Boyce's interest in the bank proceedings is fully shown in the letters written by him to Darnold, set forth in the statement in this case, from which it will be seen that, notwithstanding his knowledge of the falsity of Darnold's testimony, he recommended him as one he had always known as an honest man, who had proved himself as such "when in our employ," and recommended him to Farwell & Co., Eastern creditors of Boyce & Co., "as not only being worthy of recognition, but fully capable of holding important positions in their employ." These letters, like the one sent to Andy, speak for themselves, and shed much light upon all of the transactions in which Darnold participated. We have made this reference to Boyce's relation with Darnold and Andy because without it the facts of this case could not be fully understood. Both

sides must be placed before the camera in such a position that the picture, when developed, will present them in their true attitude, and enable the court to determine the effect of all the testimony, and the source from which the "information and belief" was obtained by complainant, and the grounds which existed for the charges made in the bill. The charges against counsel of withholding the testimony that would impeach Darnold ought never to have been made. Why should they have used Darnold's affidavit admitting that he had sworn falsely? They received it under a promise from Judge McConnell that it should not be used unless full protection should be given him. They kept faith with him, and did not use it; but they did procure the affidavits of Boyce and Curtis that Darnold had confessed to them that he had sworn falsely. These affidavits were not impeached. What more was needed? Welcome's affidavit, if it had been received in time, was simply cumulative evidence as to Darnold's perjury. Wehrspaun's testimony, if it had been obtained, would have simply added another link to the fact that Darnold had sworn falsely, which was already clearly proven. If everything in relation to Darnold had been produced, its only effect would have been to compel the court to give no heed to his testimony in the consideration of the case; and we have already shown that the supreme court declared that, if his testimony was excluded from the record entirely, it would not change the result. It is unjust and absurd to claim that the proofs of Darnold's perjury were withheld in pursuance of any conspiracy. The charges made in this regard have no reasonable foundation, and are wholly unsustained by the testimony in the record.

2. As to the failure of counsel to cross-examine certain witnesses. Under this head we will refer to the witnesses who testified that they had heard Judge Davis state that he intended to give the bank to Andy. Upon this point but little need be said. The record does not show that there were any facts within the knowledge of any of these witnesses that could have been brought out upon cross-examination that would have been of any benefit to the plaintiff's case in the bank suit. The truth is that the complainant in this suit did not introduce any testimony whatever reflecting in any manner upon the veracity of any of these witnesses. Complainant's counsel, speaking of these witnesses, say:

"They were almost universally old friends, or depositors in the bank. * * * Mr. Toole should have cross-examined these witnesses on the bank trial to find out their relations to Andy, and the fact of their indebtedness to him or the bank. * * * Substantially, no cross-examination was had of any of the witnesses, and absolutely no cross-examination of most of them. No attempt was made to impeach them, or contradict them, or show their relations to Andy. They passed before the court with their statements uncontradicted. This fact itself is suspicious."

The truth is that, notwithstanding complainant's counsel, aided by Boyce, whom they term their "co-counsel," had scoured the country in search of testimony that would impeach any or all of Andy's witnesses, they found nothing whatever that would impeach, or tend to impeach, any of these witnesses, and they stand in the record before us, as they did in the state court, "with their state-

ments uncontradicted." This fact is not suspicious: It shows very clearly that their testimony in the bank suit was entitled to full credit. And it also shows that the failure to make any extended cross-examination of these witnesses on account of any fraud or conspiracy of counsel with Andy or Talbott is absolutely without any foundation whatever. The same is true of the criticism of Talbott's counsel with reference to the course pursued by Mr. Toole and his associates relative to the testimony of Judge Knowles.

3. As to the acts of Leyson. Mr. Leyson was not appointed administrator of Judge Davis' estate until long after the trial of the action in the state court about the bank stock. His act which is alleged to show the conspiracy lies in the fact that, after the decision of the supreme court affirming the judgment of the district court in favor of Andy, he refused, upon the request of parties interested, to sue out a writ of error to the supreme court of the United States, assigning as a reason that he had consulted with his own counsel upon this subject, and had been advised by them that there was no federal question that would justify him in taking a writ of error. This action by Leyson did not prevent the other parties who made the request from taking the case to the supreme court on a writ of error, or deprive them of any of their rights. In fact, they did take the case to the supreme court, and that court held it had no jurisdiction, because no federal question was involved. Leyson v. Davis, 170 U. S. 36, 18 Sup. Ct. 500, 42 L. Ed. 939. This fact clearly proves that the administrator was fully justified in the course he pursued. The charge of conspiracy or fraud in this connection is too flimsy to require further comment.

4. As to Andy. It is claimed that when the bank suit was begun Andy knew that he had no right to the bank stock, and had so declared to numerous persons after the date of the alleged gift; and that the new evidence introduced upon this point clearly shows that Judge Davis never made the gift of the bank stock to Andy; that the whole claim on his part is fraudulent and fictitious, etc. What is this new evidence? Complainant first introduced a letter dated February, 1890, written by Andy to his uncle Calvin Davis. This is set forth in full in the record. It is a family letter. The only portion relied on reads as follows:

"Dear Uncle: * * * Uncle Andrew has been very sick, but is improving, and I hope will soon be himself again. * * * His condition worries him. And again he worries considerably because he has not fixed his business so it will be settled according to his wishes after he is gone. He says it is too late to fix matters now. I have consulted Judge Knowles and Dixon, and they say he is not in fit condition to fix his affairs at present. I hope he will soon gain his reason, and fix his affairs to suit himself, and then take a trip, and try and enjoy some of the money he has worked so hard for."

If there was no business that worried Judge Davis except the bank stock, it might be inferred that he was its owner at the time this letter was written. But the fact is that he was possessed of other property to the value of about $4,000,000. This was of itself sufficient to worry any man, whether in good or poor health. Moreover, the testimony herein shows that the judge had been in con-

sultation with Judge Knowles and Dixon about fixing his business; that he was anxious to make certain gifts of small amounts to a few friends. These things worried him. It was not the bank stock, because during these consultations he told Judge Knowles that "Andy was to have or control the bank." To understand Andy's letter, it is necessary to consider all the surroundings existing at or about the time the letter was written. The reference therein made that he (Andy) had consulted with Judge Knowles and Dixon as to his uncle's condition shows the necessity of considering all the circumstances that were discussed by Judge Davis with his counsel; and in the face of these undisputed facts, if we are permitted to draw presumptions and inferences from the language used, it would be that his uncle was worried as to what he should do with his business affairs independent of the bank stock. There is not a word in the letter inconsistent with the theory that Andy then had the bank stock; that the gift causa mortis had then been made. It was purely a family letter, and concerned the state of his uncle's health. He was not writing of his own affairs. In addition to the extract above quoted, he states to his uncle Calvin:

"Please write me, and instruct how to address a telegram, for fear I may have to wire you. We are taking good care of Andrew, and the doctor says all we can do is to keep strangers away from him, and not let him get excited. He is with the German family who have taken care of him for years."

This letter does not in any manner impeach the making of the gift as claimed by Andy, but is, in its entirety, consistent therewith. Does it seem reasonable that Andy, in such a letter, would have advised his uncle Calvin that the judge had made a gift causa mortis of the bank stock to himself? The probabilities are all the other way. His uncle Andrew, the judge, might possibly recover. If the gift had been made, it was, nevertheless, subject to revocation at any time before the judge's death. Why should he advise Calvin of the gift? Common sense—which is the soul of reason—plainly indicates to the thinking mind that he would not have done so. But it is claimed that Andy, in common-place conversations with other parties, and evidence given by him in open court after the death of the judge, absolutely admits that no such gift was made; that these matters were deliberately suppressed by the collusion of Talbott's counsel with Andy. Can this claim be sustained? Mr. Wehrspaun testified upon the trial of this suit that Andy, the day after he returned from the burial of Judge Davis, about the 14th or 15th of March, 1890, came to his residence, and took therefrom certain trunks, books, field glasses, and a pair of blankets that belonged to the estate of the judge, and thereafter took a fur robe, and lion skin, and some other things. It appears, in this connection, that Andy's sleeping apartments at the bank had been burned out, and that Andy said he had use for the blankets.

"Q. What did he say about having use for the blankets? A. He said there was not any testament. He did not know if the judge had left him anything. Q. How did he connect that statement with the blankets? A. * * * I think he made this remark: He did not know if the judge had left him anything or not, and he took the blankets. He said he had need for them."

Mrs. Wehrspaun, in corroboration of her husband, testified:

"Well, Andy took the blankets. He says: 'I do not know. I have not got very much. I will need these blankets. I do not know whether my uncle left me anything or not.'"

On her cross-examination she said:

"Andy was always joshing a great deal. He took the blankets, and said: 'I will need these. I do not know whether the judge left me anything or not.' Q. That was about the remark he made? A. In a joshing way. Q. You did not understand he said that seriously? A. No. I did not think he meant it seriously. Q. You understood it was a sort of a joking remark? A. Andy was there most of the time. He was like one of the family. I did not pay much attention to what he said. Q. You took the remark in that way, however,—in the way of a joke? A. Yes, sir."

Comment on this incident seems unnecessary. The reply of Mrs. Wehrspaun sufficiently explains the whole conversation. No one ought to be solemnly bound in a court of justice by such idle, casual, and joshing remarks. And counsel for Talbott in the bank suit should not be censured and charged with collusion and conspiracy because, with knowledge of the facts, they failed to consider the conversation of sufficient importance to be introduced at the trial of the bank suit. The charges in this respect are not sustained.

The day of the funeral of Judge Davis, Mr. Boyce had a conversation with Andy, and with reference thereto testified as follows:

"Did you have a conversation with Andrew J. Davis, Jr., on the day of the funeral of his uncle? A. I did. * * * Q. Now, Mr. Boyce, you may give in full that conversation you had with Andrew J. Davis, Jr., on the day of the funeral. A. Well, it was only a brief conversation. I shook hands with Andy. I was a pallbearer, and simply asked Andy this question: 'I suppose that the judge has provided for you, Andy?' Andy says to me that he had not; that he was solely dependent upon his salary; left solely dependent upon his salary."

This conversation, like the last, proves nothing. It was brought out by the inquisitiveness of Boyce at a time and occasion when such a subject might seem out of place. Boyce and Andy were not intimate friends. The motive of the inquiries must be looked at, as well as the falsity of Andy's answer, if it were false. It was not made under oath, nor to a friend in confidence, when the truth would naturally be told.

In Hewitt v. Lucas, 42 Ill. 296, 299, the court said:

"We should be establishing a most dangerous precedent if we were to hold that random expressions, used in casual conversations, sworn to after a long lapse of time, and improbable in themselves, can be made a sufficient basis for awarding a new trial."

Boyce, immediately after his statement as to the conversation on the day of the funeral, gave the following testimony:

"Q. Did you have other conversations with him in the bank, in March, 1890, as to the proposed testimony to be given by you in the bank suit? A. I had two conversations with him after in the bank, up in his room. Q. You may state those, please. A. In one of these—the first one—I have the original. I have a diary of it as to the date and what was said. * * * Q. State, if you can recollect, the substance of the conversation, if you can remember. A. Well, I have got the exact words; but I cannot recall them at this particular time, because I feel a little bit worried, and I want to testify to what I know are the exact words as far as I can. * * * Q. Have you got this memorandum with you to-day? A. No, sir; I have not."

This matter was then passed over until the next day, when it was again brought up, and Boyce testified that:

"I had two talks with Mr. Davis in the bank, in his room upstairs. I was making a deposit, and he called me upstairs in his rooms, and I had a private talk with him. Q. State what you said and state what he said at that time. A. Well, Andy opened the conversation with me in this matter. He said that there were certain persons had heard Judge Davis say that he intended to deed—give—him the bank stock, and, in view of my intimacy with the judge, that he had no doubt I had heard him say this, and, if I had, it would be of material benefit to him; that if he could prove by Mr. Talbott and myself and some others that we had heard Judge Davis say that he intended to give him this bank stock, or had given him this bank stock, that he could set up a claim for this; that he was so advised, etc. Q. Did you have another talk a few days afterwards with Mr. Andrew J. Davis on the same subject? A. Yes, sir. Q. State what occurred then. A. He called me up again into the same room. Asked me if I had considered this matter, and that if I could so state that I had heard Judge Davis say he had intended to give the bank stock to him, or anything of a similar character. I told him, 'No, I did not.' Q. What, if anything, was said by him in that connection, as to your affairs, if you could give this testimony? A. Well, he did not say anything directly except this: that, of course, in view of my intimacy with the judge, and the relationship that existed between us, that there would be no particular advantage in regards to myself. No promises further than it would be quite a favor that I could confer upon him, which I understood would be reciprocated to a certain extent. Q. * * * You did not tell Mr. Toole about these talks at the trial? A. No. Q. Did you tell Mr. Toole about these talks with Andrew J. Davis, Jr., before you made your affidavit? A. I did."

There is nothing unnatural in these conversations; nothing to indicate by thought, word, or deed that the gift had not been made. We must place ourselves in Andy's situation in order to ascertain the meaning and the extent of these conversations, and the effect that should be given them. Judge Davis was dead. It was supposed he had died intestate. He had many heirs. He was possessed of a vast estate. Nothing would be more natural than to anticipate litigation in regard thereto. Whatever gifts or other disposition he had made, if any, during his last illness, would undoubtedly be contested, and a bitter legal fight was sure to be made in regard thereto, as well as to the balance of the property. Andy knew, as he told Boyce, that there were several people who had heard the judge say that he intended to give the bank to him. He knew that Boyce was intimately acquainted with the judge, and thought that Boyce might have some knowledge as to the judge's talks with him upon the subject. What could be more natural than to find out the facts whether they should be in favor of or against him? Whether the information should come from friend or foe? There is not anything mysterious or suspicious about these conversations. Nothing whatever to furnish even a suggestion that Andy was trying to obtain any testimony from Boyce that was not true. No promise was made by Andy. No inducement whatever was held out to Boyce tending in any degree to have him make a false statement. The conversations are not susceptible of any interpretation which would lead to the belief that Andy did not at that time claim that a gift of the bank stock had been made to him. In the very nature of things, he must have known, if the gift had been made, that Talbott was the only witness to that transaction. All that he

could possibly do was to find out, in a legitimate and proper way, whether or not Judge Davis had made any statement of his intention to other parties to make the gift. This would, if true, tend strongly to support Talbott's testimony that the gift had been made. It is apparent that, if this testimony had been produced at the trial of the bank suit, it would not have changed the result. The same can be said of the testimony of Wehrspaun as to the conversation Andy had with him about the bank stock shortly after the death of Judge Davis, when Andy asked him if he knew anything about the disposition which the judge had made, or intended to make, of the bank stock. All that Andy wanted to know was whether the witness had heard or knew anything about the disposition of the bank stock. Upon this point the sum and substance of Wehrspaun's testimony is that he saw Andy, Judge Davis, and Talbott—and the little tin box—in the judge's room at his house; that while they were talking about the contents of the box (the bank certificates of stock) he had occasion to go into the room to fix the fire, and while there fixing the fire he saw Judge Davis holding up these papers, and said (to Andy), "These shall be yours if I do not come back;" that he then left the room, and did not hear any other conversation about the matter. This does not contradict the testimony of Talbott, and, had it been introduced, would certainly not have changed the result in the bank suit.

This brings us to the testimony of Andy given in the administration proceedings to ascertain the value of the judge's estate, in April, 1890, in order to enable the court to determine the amount of the bond which the special administrator should give. It is claimed that this testimony was suppressed at the bank trial, and that it proves there was never any gift causa mortis of the bank stock, and tends to show fraud in the cause of action itself. The stenographer who had taken the testimony of Andy read from his notes on the cross-examination of Andy by Mr. Meyers, of counsel for Mr. Root in the contest by the heirs for the estate:

"Q. Are there in that bank at the present time any certificates of stock of the First National Bank of this city standing in the name of the deceased? A. The stock ledger shows there is stock in his name. Q. Are there any certificates contained in that bank in the name of the deceased? A. No, sir. Q. Were there, at the time of his death, certificates of bank stock? A. There may have been in the bank vault; yes, sir. Q. Do you mean to say you are in doubt about it? A. Yes, sir; they may have been in my pocket. Q. At the time of his death? A. Yes, sir. Q. When are you sure they were in the bank and not in your pocket? A. Last night. Q. With reference to the time of his death, when did they first come into your pocket, as far as you can recollect? A. December, 1889. Q. Who gave them to you then? A. The deceased. Q. Where? A. At his room, at his residence. Q. What did he tell you to do with them? A. He told me to take them and keep them. Q. For whom? A. For myself. Q. Did he say that? A. Yes, sir. Q. Why do you hesitate? A. I hesitate to think. He did not say it in just those words. Q. What words did he use? A. As near as I can remember, he told me to take these certificates and keep them. We had quite a talk, and it was a very affecting talk. He gave me to understand that he was just carrying out his promise. Q. Kindly tell us to the best of your knowledge what he said on that occasion? A. He was preparing to go away. He asked me to bring his little tin box down. That is this one in court. He opened it, and started through the box. He had been talking two or three days before

about going away, etc., and he took out some of the certificates, and asked me how many shares were represented in this, and I told him. Q. How many did you tell him? A. I do not know how many I told him. I figured it up, and told him how many were there. I told him there was more in his name. He asked me if that was all. I said, 'No,' there was many shares more. I started through the box then after I put them altogether folded them up, and handed them to him. He took them, and handed them back to me. He told me they were the stock. He wanted me to take it and keep it. He told me he was going away, and he did not know as he should ever return. He gave me to understand that life was uncertain. He might meet with an accident, and he had promised it to me; that I had worked for it, and deserved it. That is what he said on that occasion. I may have left one word out. I cannot repeat it word by word exactly what he told me. He wanted me to take it, and keep it. It was mine in case anything should happen to him. * * * Q. Are you sure that he said it was yours if anything happened to him? A. Yes, sir. He referred to different things,—railroad accidents and death,—and he was not feeling well when he left here. * * * Q. Did he indorse any of the certificates in writing? A. No, sir. Q. Do you know why not? A. I think I do; yes, sir. * * * * Q. Do you know why not? What did he say to you on that subject? A. Nothing. Q. What fact is there within your own knowledge explanatory of his failure to sign them? A. Well, I do not know, unless it is that he intended, as long as he was alive, to have that stock for himself. * * * Q. Do you mean that he gave it to you, in common phrase, 'with a string to it'? A. I might call it that way. Q. Then he gave it to you, and yet retained ownership in it himself? A. I suppose he wanted it to stand in his name; wanted no other person to own it until after his death. * * * Q. What did he say? A. I do not remember exactly what he did say. Q. Give it altogether as near as you can. A. Of course, it would take me some time to think of it. You do not understand the relations between Judge Davis and myself, and do not understand what I thought of him, and what these moments meant. It was talk that happened before two or three times,—talk that he was about to die, being sick. And I would always try and encourage him,—tell him that it was not so; and for that reason I would only catch a word once in a while. I would not hear it all. And, besides that, Judge Davis' speech was not clear. I could understand it, but he would muffle. He could not control the right words when he got to talking on these subjects, and really I could not say what he said about dying at this particular time. Q. Tell us as near as you can. A. He gave me to understand that he was going away to take a trip for the benefit of his health,—that he really did not want to go,—to see if he could not improve some; and that he did not care about going. He would just as lief remain home, but thought it was necessary to prolong his days. He started out in that way, and I would brace him up about that. He would say there might be a railroad accident, or something of that kind. I am not sure about it word by word. This is just the incident. Q. Of course, this is a matter to which you have given some thought since his death? A. Yes, sir."

At this point in the testimony there was an objection interposed that this witness was only offered as to the valuation of the property. The court then said:

"The testimony has gone far enough to show that there will be a controversy about this, and the court is not called upon to pass upon this controversy. The court will take into consideration this question, and the possibilities of the case."

The testimony proceeded as follows:

"Q. Who was present at the time of this conversation? Your answer was, 'Mr. Talbott,'—and who else? A. No person. Q. And you have told the conversation as near as you can recollect it? A. Of course, other conversations might refresh my mind; but this is all I remember. Q. Was there any meeting of stockholders or election of stockholders after that? A. Yes, sir. Q.

108 F.—11

When? A. Along in January some time. Q. Who voted that stock? A. John E. Davis. Q. Your brother? A. Yes, sir. Q. Under a proxy? A. Yes, sir. Q. From whom? A. A. J. Davis, my uncle."

Upon his redirect examination by John Forbis, the following testimony was given:

"Q. What did he [Judge Davis] say about the gift? Was it to take effect at that particular minute, or when was it to take place? A. When he was dead. Q. That gift was to take effect upon his death? A. Yes, sir. Q. Did he say anything about who would manage the stock during his lifetime for the bank? A. No, sir."

It will be observed that there is much in this testimony that corroborates the testimony of Talbott, and tends to show that the gift was actually made. Some questions were asked and answered as to what he thought the judge meant or thought at the time, and it is in this respect that complainant's counsel contend that his answers admit that there was no gift causa mortis made at that time. It is apparent, independent of any reference to other testimony upon the subject, that Mr. Meyers, in his cross-examination of Andy, was, in common parlance, "on a fishing excursion," hoping to find something that might aid the heirs in bringing 'a suit to recover the stock from Andy. The court might very properly have said sooner than it did, whether any objections were made or not, that it would not hear any testimony concerning the merits of that case. The simple fact that there was liable to be such a suit was of itself enough to enable the court to determine what the amount of the bond should be, and that was the only question to be determined in the proceedings then before the court. It is seriously charged, however, that this evidence was willfully suppressed by the counsel for Talbott in pursuance of the fraud, collusion, and conspiracy alleged in the bill of complaint. In limine, we pause to consider for a moment the position in which counsel for Talbott were placed with reference to the introduction of this testimony. It must be remembered that Andy was disqualified under the laws of Montana (Comp. Laws, §§ 646, 647) from introducing himself as a witness to establish the gift, and that, if they introduced his testimony in the probate proceedings, he could be called upon in his own behalf to explain this testimony. Was it policy to do so? This was the suggestion evidently presented to their minds. Was it their duty to do so? Upon this point men may differ in opinion. If they introduced the evidence, they would have to take the chances of an explanation being given by Andy that might result disastrously to their contention that no gift causa mortis was ever made. Moreover, it was a doubtful question, at best, whether the testimony of Andy given at such hearing was susceptible of being construed in favor of their contention. Under these circumstances counsel were called upon to determine their duty in the premises. They decided that the risk was too hazardous, and came to the conclusion that it was the better policy not to introduce it. They were called upon in advance to exercise their best judgment, and, if they did, and had no other motive, and were not guilty of any fraud or conspiracy, it cannot be said that the course pursued by them, even if they erred (which we do not

admit), would furnish any ground whatever for enjoining the judgment rendered in the state court.

Complainant relies, among other things, upon the testimony of one Corbett, who was an attorney for the heirs in their contest for Judge Davis' estate. Waiving all the objections that were made to the admissibility of Corbett's testimony, we shall proceed to consider it. Mr. Corbett testified that he had frequent consultations and conversations with Messrs. Toole & Clayberg and other counsel during the trial of the bank suit, and then gave the substance of the conversation had with Mr. Clayberg, as follows:

"Q. State whether or not Mr. Toole or Mr. Clayberg ever informed you as to whether or not this declaration of Andrew J. Davis, Jr., was offered in evidence at the trial. A. Mr. Clayberg informed me that it was not. Q. Did you hear anything stated by Mr. Clayberg at any time as to why not? A. Yes, I did. Q. Will you please state it? A. * * * I made some complaint that it had not been introduced, and asked why it had not been introduced. I remember the answer being something to this effect: 'Well, if your client don't want you to do a thing, what are you going to do about it?' That was about the size of the expression or the effect of the expression. I think in fact that they were his very—very near the—exact words."

Mr. Clayberg, when called as a witness, and asked what he had to say about Corbett's statement upon this point, replied:

"I thing Mr. Corbett is mistaken in regard to it. I have no recollection of ever making any such statement as that. * * * Q. Would you or not remember, Mr. Clayberg, if you had made such a remark as that? A. I think I would."

Mr. Clayberg, in answer to other questions, testified as follows:

"Q. What would you have considered it as proper to do, as an honorable attorney, in a case like the bank-stock case, where your client and the plaintiff was acting in a fiduciary capacity, if he had advised or requested you to omit any testimony that was material? A. I do not think I would have paid any attention to it. All of us insisted that Mr. Talbott's testimony was directly against us, and our instructions were to go ahead, and do the best we could in the case. I don't think we would have listened to any suggestion he might have made as to the putting in of testimony. Q. Did he at any time give you any directions or instructions as to what testimony you should put in or leave out? A. He never did to me. I don't think he did to any one. Q. In the matter of admitting this testimony of Andrew J. Davis, did you or the other counsel in the case, so far as you know, follow anybody's direction or advice, or did you act upon what you thought was best for the interest of your clients in the case? A. I don't think anybody gave us any directions in regard to it at all. We acted according to what we believed to be the best interests of the case."

Mr. Toole, was called as a witness, and testified as follows:

"Q. Was the testimony of Andrew J. Davis, Jr., in the proceedings on application for letters of administration used on the trial of the bank-stock case in the district court? A. It was not. Q. Why was it not? A. Well, sir; at the time the testimony of Mr. Davis and Mr. Talbott was taken I think I was quite particular to draw out of them everything they knew in reference to the alleged gift, and that, if there was anything wrong about it, it would probably take them at a time when they had not thoroughly examined it. I got up, and went over to Mr. Meyers, * * * and suggested that fact to him. * * * We managed to get out about all that was possible to get from Mr. Davis, * * * and we did it for the purpose of ascertaining the exact condition of things with a view of the institution of suit on behalf of the heirs to determine the right to this bank stock. The question arose in a collateral way; that is to say, the examination as to the ownership

of this stock pertained solely to the question of the amount of bonds that was to be given in the case by whoever was appointed administrator of the estate, and was not in any proceeding to make a final adjudication or determination of the title to the stock. It was collateral to that extent. The testimony was taken down by the stenographer, and copies furnished, as I have stated. Q. Did Mr. Andrew J. Davis, Jr., testify in the bank-stock case, do you know? A. Upon the trial of the bank-stock case he did not. Q. Did he offer to testify? A. He offered to testify, and we objected to his giving testimony on the ground that he was not a competent witness under the statute, and the court sustained the objection. Q. * * * I believe you did not get through in regard to the first question I asked you, as to why? A. I did not complete that. * * * We held divers consultations upon the propriety of introducing the testimony of Andrew J. Davis, Jr., that had been given upon the trial in the probate matter, and came to the conclusion that it was not policy to do so. We were all unanimously of the opinion that if we sought to introduce any portion of that testimony, that they would have the right to have it all introduced; and we were also of the opinion that it would render Mr. Davis a competent witness to go in and explain any matters that would appear ambiguous or uncertain, and also give him an opportunity to make statements as to other matters which he had offered to state. For this reason we did not deem it policy to introduce the affidavit, or, rather, testimony, that he had given on the trial of the bank-stock case, and for this reason we objected to him as being an incompetent witness. We were further of the opinion that his testimony would be damaging to us. As it was, it rested solely upon the testimony of Mr. Talbott, and we got a number of circumstantial facts which we considered tended to disprove his statement as to the actual execution of the gift and control of the bank."

Who can say, in the teeth of all the facts, conditions, circumstances, and surroundings to which we have called attention, that counsel were not acting in good faith, and guided solely by the best motives, and in the exercise of sound judgment? Certainly, no impartial mind can say that there was any fraud or collusion in withholding any of the testimony herein referred to upon the part of Andy or of Talbott's counsel.

5. As to Talbott, special administrator, and his counsel. Talbott, as shown in the statement of facts, was appointed special administrator of the estate of Andrew J. Davis, deceased. He was thereafter directed by the court to bring an action against Andy to recover the bank stock which Andy claimed belonged to him. In bringing this action he employed the attorneys who had represented Root in his contest on behalf of certain heirs against John A. Davis for appointment as administrator of Judge Davis' estate. These counsel, if they were honest, upright men, would naturally do the best they could within the range of their legal ability to secure the bank stock for their former client, and to faithfully represent the special administrator in his effort to recover the bank stock from Andy. It was natural for Talbott, as special administrator, if he desired to do his duty in the premises, to employ these counsel. His act in so doing was evidently satisfactory to the heirs who were represented by Mr. Root, and to Mr. Root himself. No complaints were made by them, or either of them, or by any of the parties interested, as to the employment of these counsel by Talbott. Throughout the trial of this suit Mr. Root, who is an attorney, frequently consulted with Talbott's counsel as to the best course to be pursued, and in many—not all—of the charges of alleged fraud and conspiracy against Talbott's counsel of failing to cross-examine wit-

nesses or to introduce testimony, etc., approved the action pursued by Talbott's counsel. There is no pretense that Root was acting in bad faith, was guilty of any wrong, or a party to any fraud, collusion, or conspiracy in favor of Andy. Talbott informed the counsel when he employed them that he would be called as a witness on behalf of Andy, as he was present and heard the conversation between the judge and Andy about the bank stock. To quote the language of Mr. Toole, Talbott said he "had selected us to represent the interests of the heirs, and that it was his desire that we should take hold of it in their interests, as if we had been employed by them; and that on account of this relation of his to the case as a witness that he left the entire matters in our hands to conduct. From that time on we conferred with Mr. Root, and he was the man that assisted us in the prosecution of the case. * * * Q. I ask you, Mr. Toole, if either Mr. Talbott or Mr. Leyson, in this bank-stock case, ever told you or intimated to you that they desired you to do anything whatever that would favor Mr. Davis' claims in the matter? A. Certainly not. If he had done such a thing I do not believe there was an attorney in the case that would not have withdrawn from it at once." The most important charge of conspiracy made by the complainant to be here considered is that:

"When Talbott testified at the bank trial for Andy, Mr. Toole and the attorneys for the plaintiff in the suit knew that he was a man unworthy of belief, a gambler, and keeper of disreputable resorts; and nevertheless deliberately refused to impeach him, although he was the sole witness to establish for Andy a million dollar gift."

What are the facts as shown by the testimony in relation to this charge? Complainant in this suit introduced three witnesses—Mrs. Niedenhofen, Ed. Potting, and William Wilson,—who each testified, in substance and effect, that they knew Talbott's reputation in 1894, and at the time they gave their testimony, for truth, and for honesty and integrity, in the community where he lived, and that "it was bad." It incidentally appears from their testimony that two of them had had differences with Talbott in certain transactions, and that ill feeling existed on account thereof. Waiving, for the time being, the objections made to the admissibility of their testimony, we proceed to consider it. Mrs. Niedenhofen was engaged in business as a merchant. Potting was her friend and partner in that business. She had known Talbott for about 20 years, but had only known him intimately for about 2 years. Her son married Talbott's daughter in 1896. The son died one year and nine months after he was married. The difficulty she had with Talbott related to the burial of her son. There was a controversy between the families as to where he should be buried. Mr. Wilson testified that he had known Talbott for over 30 years; that Talbott, in 1865, resided in Virginia City, and was "running a kind of a gambling joint—gambling house—at that time"; that he knew Talbott in Beartown, in 1869, and that "he was running a small gambling house at that time"; that he knew Talbott in Deer Lodge, Mont., between 1870 and 1872, and that he was then engaged in "the same occupation, * * * keeping a gambling house and saloon"; that he

knew Talbott at Butte, Mont., between 1876 and 1877, and that he then kept a "gambling house." On his cross-examination this witness testified:

That he had fallen out with Talbott about two years ago, and had a pretty bitter feeling against him ever since. That he had run a gambling house himself at Deer Lodge and Butte, Mont., in 1870 or 1871. "That he never dealt anything but faro, * * * but they were square games. Gambling is different now to what it was then. Q. Will you please state what your own reputation is for truth and veracity in Butte? A. Of course, I say it is good. * * * Q. Mr. Wilson, do you consider that you are entitled to rank as a man of truth, honesty, and integrity in spite of the fact that you kept a gambling house? A. Yes, sir. * * * Q. Were you ever connected with Mr. Talbott in any of his gambling houses? A. Yes, sir. Q. You were a partner with him? A. Yes, sir. Q. Where? A. In Deer Lodge. Q. Whenever he run a gambling house there, you were in partnership with him? A. Yes, at one time. Q. That was the same character of a gambling house he ran afterwards? A. That he ran; yes, sir. Q. The same character? A. The same exactly in Deer Lodge. They were very similar. Q. Is it not a fact that that was a first-class gambling house? A. Square gambling at that time, both of them; that is, in my house, anyhow, it was square. * * * Q. Mr. Talbott was connected in the early days here with the most respectable gambling house in Butte? A. One of them; yes, sir. Q. Was it not the most respectable at the time he was in it? A. It was one of the most. It was a very respectable house, as far as that is concerned. Q. It was as good as any of them? Everything was on the square? A. Oh, yes."

This witness was then asked as to his knowledge about Talbott having been employed in connection with the business of Judge Davis:

"Q. Do you know that he remained as a confidential man of Andrew J. Davis, deceased, up to the time of his death? A. I know he has been a very confidential man with him. Q. In mining matters? A. Yes. Q. And that he did not gamble after that time? A. I never seen him gamble after that. Q. At the time that Mr. Talbott ran a gambling house here, gambling was a legitimate business, authorized by the law of the state,—licensed,—was it not? * * * A. Yes, sir."

The district court in rendering its opinion herein very properly said:

"If gambling impeaches Talbott's character, it is difficult to understand why it would not also that of this witness, and especially as his testimony shows that he has not entirely reformed all his wild ways. If Talbott is of the very bad character charged, it is strange that after a long residence in Butte, where he has been engaged in active business, some entirely reputable and unprejudiced witness could not be found to say so. Courts cannot hold that the character of a witness is so impeached that his testimony must be disregarded, except upon the testimony of witnesses who are themselves above impeachment, and by such unequivocal testimony from them that it cannot be doubted."

Why should counsel in the bank suit have attempted to impeach Mr. Talbott? Judge McConnell was called as a witness in this case, and upon his cross-examination was asked by complainant's counsel several questions touching Talbott's character:

"Q. Was the question of impeaching Mr. Talbott by reference to his early record a matter of discussion at all between the attorneys? A. Mr. Talbott was discussed between Mr. Clayberg and myself a good deal. * * * I remember his history being discussed in connection with this lawsuit, and that it was developed very much as Mr. Toole has described it in his testimony. His days of gambling were a considerable period before the time this lawsuit

was instituted, and took it practically so far back that it might be said to have brought it within the statute of limitations; in other words, that the period of business life had existed, and a number of years had intervened, so that practically that part of his history that contained that had nothing to do with the lawsuit. * * * Q. You do not mean to say that all good, religious, church members in Montana approve of a man who has been engaged in gambling? A. I do not think any men of that class approve of gambling. * * * If they had known he kept a gambling house ten or fifteen years before, and had absolutely quit it, I do not think they would condemn him. They would rather applaud him, because he had quit. I don't think it would be brought against him. I believe that the Christian law of forgiveness would have been the doctrine that the best people would have adopted with regard to that class of men."

When asked upon cross-examination whether, from his knowledge of the conditions in Montana, if the fact that a man has been a gambler would affect his credibility as a witness, he replied: "A. That depends entirely upon what class of a gambler he is." Assuming, then, that the witness is a man who is engaged in business of a legitimate character, and has been so engaged for years past, and as a business man stands high before the community since he has ceased gambling? "A. A man of that description, and such as Mr. Toole describes Mr. Talbott to have been, could not be discredited in this country before a court or jury, in my judgment, by bringing up his past history for gambling, where he had quit it, and established a business reputation for honesty in business of a number of years' standing between the period he indulged in gambling and the time he is sought to be impeached. The truth is, to go back and take up that kind of a charge against a man of that character would prejudice your case."

The reasons given by this witness for his opinions were in strict accordance with the views frequently expressed by the courts upon the same or similar subjects.

In Baker v. Com. (Ky.) 50 S. W. 54, 56, the court said:

"We do not understand that the entire past lives of witnesses are liable to be ransacked and exposed, and the whole history of their lives laid bare. We are of opinion that the period concerning which the inquiry is made should bear some reasonable relation to the time at which the testimony is given, and that a period of fifteen years is too remote."

In Greenl. Ev. (15th Ed.) § 459, the author says:

"The examination being governed and kept within bounds by the discretion of the judge, all inquiries into transactions of a remote date will, of course, be suppressed; for the interests of justice do not require that the errors of any man's life, long since repented of, and forgiven by the community, should be recalled to remembrance, and their memory be perpetuated in judicial documents, at the pleasure of any future litigant."

See, also, State v. Gesell (Mo. Sup.) 27 S. W. 1101; State v. Parker, 96 Mo. 382, 390, 9 S. W. 728; State v. Houx, 109 Mo. 654, 663, 19 S. W. 35; Whart. Cr. Ev. § 472.

Why should we be called upon to answer complainant's question? The mere fact that a man had in his early life been engaged as a gambler does not of itself establish the fact that he is unworthy of belief. It depends upon the man. There are men who move in good society, and are members of the church, whose reputation in the community where they reside for truth and veracity is bad, and whose reputation for honesty and integrity is not good. On the

other hand, there are gamblers who have been engaged in that business for many years, who mingle mostly with men engaged in the same occupation, whose reputation for truth, for honesty, and integrity is not bad. A man may indulge in many vices to such an extent as to destroy his general character, yet his truthfulness and veracity may be absolutely unimpeachable. When it is considered, as this record shows, that Talbott had quit gambling; that he had the confidence of business men; that he was trusted in the management of extensive mining operations; that he had held positions of trust, and had never betrayed the confidence reposed in him; that for years he had been the special administrator of Judge Davis' vast estate, and had so managed it, and at the close of the compromise thereof he had accounted for the same, and turned it over as required by law, without even a suggestion of any wrongdoing, and without a murmur of dissent on the part of any of the numerous heirs against any of his acts or conduct in relation thereto,—we are irresistibly led to the conclusion that Judge McConnell was right when he said in his testimony that for counsel to go back and present a charge "against a man of that character" would only prejudice his case.

In State v. Larkin, 11 Nev. 314, 330, the court had under consideration the question whether the district court had erred in refusing to give the following instruction:

"The jury may, and it is their duty to, take into consideration the chastity or want of chastity of any witness for the state in determining the credibility due such witness."

In discussing this question, among other things, the court said:

"This instruction is not confined to any particular witness. It was, as we think, intended to mislead the jury, and was properly refused. It tells the jury, in effect, that want of chastity is sufficient to destroy the credibility of a witness. As a general proposition, to be applied indiscriminately to all cases, this is not true. A witness may be unchaste, and yet be truthful. A witness may be chaste, and yet be untruthful. The law affords ample remedies for testing the credibility of witnesses without introducing testimony of specific acts of immorality, and in particular instances allows greater latitude than in others, owing to the special facts and circumstances that surround each individual case. There are, perhaps, exceptional cases where it might be proper to show the utter depravity of the moral character of a witness in order to establish the fact that such a witness is not entitled to any credit. But we are not dealing with the exceptions. The general rule, as recognized by a majority of the decided cases, is that evidence of bad character for chastity, where such character is collaterally, not directly, in issue, is not admissible for the purpose of impeaching the credibility of a witness."

To the same effect, see People v. Un Dong, 106 Cal. 83, 88, 39 Pac. 12; Matthews v. Lumber Co. (Minn.) 67 N. W. 1008; Calkins v. Railroad Co. (Mich.) 78 N. W. 129; Rhea v. State, 100 Ala. 119, 122, 14 South. 853; Thrawley v. State, 153 Ind. 375, 381, 55 N. E. 95.

6. The wholesale charges of dishonesty and conduct unbecoming attorneys in accepting fees on both sides is hardly worthy of any reply. Forbis & Forbis and Dixon & Kirkpatrick, of counsel for Andy, are virtually charged with unprofessional conduct because they accepted fees both from John A. Davis and from Andy. We have set forth in the statement the facts in relation thereto. The agreement made by counsel and the additional agreement signed

by John A. Davis of themselves honorably acquit these counsel from any blame, wrongdoing, or improper conduct in the premises. They are not deserving of any censure or criticism, and need no further justification. The charges against Toole, Clayberg & McConnell, of counsel for the estate, are wholly unfounded, and have no support from any evidence contained in this voluminous record. There is nothing that reflects upon their honor as lawyers, or upon their integrity as men. They may have made some mistakes in the trial of the bank suit. But, in view of all the surroundings, we are unwilling to say, as a matter of fact or of law, that they did. They had to act from all the circumstances within their knowledge, without knowing what the particular result might be. They exercised their best judgment; and, after all is over, looking backward, it is easy for the parties interested, who lost the case, to say that it might have been better if counsel had acted differently. That can always be said by the losing party in the trial of any case. But we are not prepared to say that they ought to have pursued any other course than what they did. Certain it is that there was not anything in their conduct or management of the case that tends to show, in the remotest degree, that they acted as they did in pursuance of any fraud, collusion, or conspiracy of any kind with anybody.

7. We decline to discuss the motion made by complainant in the court below that she be allowed to amend her complaint so as to include additional charges of bribery and corruption. In the light of all the circumstances disclosed in the record in relation thereto, it is sufficient to state that, in our opinion, the court did not err in refusing the motion.

8. There are numerous other specific points made by complainant, and many pages of testimony in regard thereto, which we deem unnecessary to discuss. It is enough to say that we have examined each and all of them as carefully as the points we have discussed, and have arrived at the conclusion that upon the whole record, notwithstanding the peculiar and suspicious circumstances contained therein, the appellant has failed to make out a case that would justify this court in granting the relief prayed for. The decree of the circuit court is affirmed, with costs.

ROSS, Circuit Judge, dissents.